# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>THOMAS ALFRED BRYDON,<br><br>　　　　Defendant. | Case No. CR04-0103<br><br>REPORT AND RECOMMENDATION |

_____

This matter comes before the court pursuant to defendant's May 4, 2005 motion to suppress evidence (docket number 24). This matter was referred to the undersigned United States Magistrate Judge for the issuance of a report and recommendation. The court held an evidentiary hearing on this motion on May 16, 2005, at which the defendant was present and represented by attorneys Scott Peterson and Eric Tindal. The government was represented by Assistant United States Attorney Teresa Baumann. As set forth below it is recommended that defendant's motion be denied.

## MOTION TO SUPPRESS

Defendant's motion to suppress arises out of the search of his residence on June 19, 2003. First, the defendant challenges the officers' initial entry into his residence, arguing it occurred without the defendant's consent. Second, the defendant argues that the officers' actions, once inside the defendant's residence, violated his Fourth Amendment rights in that the officers purposefully expanded their search after the defendant unequivocally refused to consent to a search. The defendant contends that neither the "plain view" nor the "exigent circumstances" exception to the warrant requirement applies. The government resists defendant's motion, arguing that the defendant voluntarily allowed the officers to enter his residence on June 19, 2003, and while lawfully inside the

1

officers observed illegal items in plain view and learned that the defendant had committed a driving offense. The government further argues that the sweep search of the residence for additional suspects was lawful. The court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

At or around 3:30 p.m. on June 19, 2003, Detective Lance Miller of the Marion Police Department received a call from an employee of Car Quest Auto Parts named "Josh." Josh informed Detective Miller that a man had just been in the store, purchased two cans of starter fluid, inquired about buying an entire case of starter fluid, and inquired about the purchase of a propane torch. In a subsequent telephone call with Detective Gary Gerber, Josh described the person as a white male, wearing a white jersey-type shirt, a red baseball cap, and driving a white automobile with license plate number 930 MRK. Detective Miller ran the license plates and discovered that license plate number 930 MRK were actually registered to a 1986 red and black minivan owned by Brian Bolsinger at 230 Normandy Drive in Marion. Detective Miller knew of Mr. Bolsinger through previous official dealings. He and Detective Gerber proceeded to 230 Normandy Drive in Marion.

Upon arriving at 230 Normandy Drive in Marion, Detectives Miller and Gerber saw the vehicle described by Josh and bearing the license plate number 930 MRK. There was also a silver Chevy Lumina parked in front of the residence at 230 Normandy Drive.[1] They were not in uniform and were driving an unmarked vehicle. The detectives approached the residence, entered the covered porch area (either through the outside screen door or through a large hole in the wall of the porch which had a ramp leading to it (See Exhibits 1-3)), and knocked on the interior door to the residence. The defendant promptly answered the door. The detectives did not have their weapons drawn, nor did they ever

---

[1]It was parked in a location that indicated to the police that it was associated with that particular residence.

brandish their weapons. The defendant matched the physical description provided by Josh of Car Quest. Detective Miller introduced himself, showed the defendant his badge, and stated that he and Detective Gerber were there to investigate a report that the defendant had purchased some materials from Car Quest that are commonly used to manufacture methamphetamine. The defendant provided his name. Detective Miller asked if they could step inside the defendant's residence. The defendant did not verbally reply, but opened the door wider, backed up, and stepped aside so as to make room for the detectives to enter. The detectives stepped inside the residence. The defendant did not object to their entry. Once inside the residence, the detectives could see into the living room. The detectives also saw another man walking toward the living room area from the back hallway.

The defendant admitted that he had recently driven to Car Quest and bought two cans of starter fluid, but said that he did so because he had been having trouble starting his car. The defendant denied that he had asked about purchasing a case of starter fluid. When questioned about the license plates on the white car, the defendant admitted that he had put them on the white car, but did not offer an explanation as to why the plates were registered to a different vehicle. When asked, neither the defendant nor the other man in the residence claimed ownership of or knowledge regarding the Chevy Lumina parked in front of the residence. The defendant was cooperative in his discussions with the detectives, pleasant in his demeanor, he appeared to understand the purpose of their visit, and he did not appear to be intoxicated or under the influence of any illegal substances.

When asked for identification, the other man in the residence stated that his name was "Larry May" from Arizona. The detectives ran the name through both the Iowa and Arizona databases, but it came back without a match.

Detective Miller asked the defendant if he and Detective Gerber could search his residence. The defendant refused his consent for the search, but did not ask the detectives to leave his residence.

While continuing to visit with the defendant, Detective Miller saw what appeared to be a gun on a nearby countertop ledge. It was 10-15 feet away from the defendant and 10-15 feet away from Detective Miller. Detective Miller walked over to the weapon to see if it was a real gun. Detective Miller picked up the weapon, examined it, and determined that it was a pellet gun. While he was standing by the countertop ledge examining the weapon, Detective Miller saw a homemade bong in the kitchen. He was looking through a lattice covered opening that separated the living room and the kitchen.

Upon determining that the weapon was a pellet gun, Detective Miller returned the weapon to its original location and returned to where he was standing upon initially entering the residence. Detective Miller then looked around the living room and mentally noted the location of several knives in his view. He also saw aluminum foil, baggies, cut straws, and propane torches on or around the coffee table in the living room, as well as a full-face military style gas mask hanging on the wall. Detective Miller knew that such items were commonly used in the manufacture of methamphetamine.

At this point, Detective Miller heard back from dispatch that the defendant did not have a valid drivers' license. A back-up officer arrived at the scene. Detective Miller briefed the back-up officer as to the situation and asked him to handcuff the other man in the residence. The defendant was not placed in handcuffs at this time, but Detective Miller testified that he would not have let the defendant leave the residence if he had asked to go. Detective Miller asked the back-up officer to conduct a walk-through search of the residence to look for additional people. In doing so, the back-up officer saw what appeared to be a methamphetamine lab in one of the back bedrooms. Detective Miller viewed the lab, without touching anything, to determine whether it posed a safety risk to the officers or the neighborhood. Upon determining that it did not, Detective Miller exited the residence, intending to apply for a search warrant.

The defendant was taken out of the residence and arrested for driving without a license and keeping a disorderly house. Detective Miller then contacted drug task force

Officer Claude Howard and summoned him to the scene. When Officer Howard arrived, Detective Miller took him back into the residence to show Officer Howard what Detective Miller had observed in the residence, including the drug paraphernalia and the small methamphetamine laboratory.

Upon leaving the defendant's residence, Detective Miller returned to the police department to write a report documenting the events at the defendant's residence, which in turn was attached to the search warrant application. Officer Howard was the affiant who actually obtained the warrant. Upon securing and executing the search warrant, the government seized various methamphetamine manufacturing items.

## CONCLUSIONS OF LAW

### The Initial Entry into Defendant's Residence

The defendant challenges the initial entry of the detectives into his residence. The government responds that the defendant's actions clearly indicated that he voluntarily consented to the detectives' entry into his residence.

The Fourth Amendment generally prohibits the warrantless search of a suspect's person, vehicle, home, or business. The prohibition does not apply, however, to situations in which voluntary consent has been obtained from the individual whose property is searched. Illinois v. Rodriguez, 497 U.S. 177 (1990). Police officers may search an area, even without probable cause or a warrant, if someone with adequate authority has consented to the search; however, prosecutors must demonstrate voluntariness of the consent by a preponderance of the evidence. United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994); accord United States v. Matlock, 415 U.S. 164, 171 (1974); Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); United States v. Chaidez, 906 F.2d 377 (8th Cir. 1990); United States v. White, 81 F.3d 775, 780 (8th Cir. 1996).

A voluntary consent need not amount to a waiver; consent can be voluntary without being an "intentional relinquishment or abandonment of a known right of privilege." Schneckloth, 412 U.S. at 235 (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). In

order to rely upon the justification of a consent search, the government must demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Id. at 218. Whether a consent to search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. United States v. Lee, 886 F.2d 998 (8th Cir. 1989).

A person's consent to a search may be inferred from his words, gestures, and conduct. United States v. Gleason, 25 F.3d 605, 607 (8th Cir. 1994) (citing United States v. Barahona, 990 F.2d 412 (8th Cir. 1993)). See also United States v. Hampton, 260 F.3d 832, 835 (8th Cir. 2001) (finding the defendant consented to the police's entry into his home where the defendant literally opened the door to admit the police into his home and there was no evidence tending to show any use of force, coercion, or deception by the police); United States v. Almendares, 397 F.3d 653, 662 (8th Cir. 2005) (finding it was reasonable for police officers to believe that the defendant consented to them taking a DNA sample where the interpreter stated that the defendant consented, the defendant opened his mouth for the swab, did not object at any time, and was pleasant and cheerful with the police during the interaction); United States v. Morreno, 373 F.3d 905, 911 (8th Cir. 2004) (finding defendant's actions in placing his backpack on the ground for the officers to examine supported the conclusion that he voluntarily consented to the search); United States v. Boyd, 180 F.3d 967, 977-78 (8th Cir. 1999) (finding it was reasonable for the marshals to believe they had homeowner's consent to enter the home where the marshals knocked on the door, told the homeowner that they had a warrant for the defendant, and the homeowner looked upstairs, pointed and said, "He's up in his room.").

Factors to consider in determining voluntariness of consent include (1) the suspect's age; (2) his general intelligence and education; (3) whether he was intoxicated when he consented; (4) whether Miranda warnings had previously been given or the suspect informed of his right to withhold consent; and (5) whether, because he had previously been

6

arrested, the suspect was aware of the protections afforded under the legal system. Chaidez, 906 F.2d at 381. See also United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000); United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994) (applying Chaidez factors). Additionally, the court looks to determine whether subtle forms of coercion flawed the suspect's judgment, whether consent was given in the confines of a police station, and whether the defendant was mentally deficient or unable in the face of custodial arrest to exercise free choice. Laing v. United States, 891 F.2d 683 (8th Cir. 1989). The length of detention, whether there was repeated and prolonged questioning, and the use of physical punishment such as the deprivation of food or sleep must also be considered. Schneckloth, 412 U.S. at 226.

In examining the environment in which consent is given, courts should ask whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) either objected to the search or stood by silently while the search occurred. Chaidez, 906 F.2d at 381; Laing, 891 F.2d at 686; United States v. Gipp, 147 F.3d 680, 686 (8th Cir. 1998).

Like the defendant in Hampton, the defendant in this case literally opened the door for the police, stepped aside and opened the door further when they asked to enter, and voiced no objection when they stepped into his residence. The defendant was 34 years old as of June 19, 2003, was pleasant and cooperative with the detectives, and he did not appear to be either of below average intelligence or intoxicated. At no time did the defendant ask the detectives to leave his residence. There is no evidence of police coercion, threats or deception. The defendant's criminal history demonstrates that this was not his first encounter with police. Considering the totality of the circumstances, the court finds that the government has met its burden of proving by the preponderance of the

7

evidence that the defendant voluntarily consented to the detectives' initial entry into his home.

### Detective Miller's Search of the Weapon

The defendant next challenges Detective Miller's search of the weapon on the countertop, arguing that the search was unlawful as it occurred <u>after</u> the defendant had unequivocally refused to consent to a search of his residence. It was during Detective Miller's search of the weapon that he saw a homemade bong device through the lattice covered opening to the kitchen. The defendant further argues that the exigent circumstances exception to the warrant requirement does not apply as the criminality of the replica gun is not readily apparent. The defendant contends that the focus of the inquiry is the dangerousness of the person, not the dangerousness of the item, and the defendant was pleasant and cooperative throughout the entire encounter.

The government responds that Detective Miller's did not violate the defendant's rights when he picked up the weapon and investigated it, given the totality of the circumstances. Given the legality of this search, the government argues, Detective Miller's observation of the homemade bong device through the lattice covered opening was in his "plain view," making it lawful as well.

"For evidence to be legally seized pursuant to the plain-view doctrine, the officer must not have violated the fourth amendment to be in the place where the evidence could be plainly viewed, the incriminating nature of the evidence must have been immediately apparent, and the officer must have had 'a lawful right of access to the object.'" <u>United States v. Terry</u>, 400 F.3d 575, 580 (8th Cir. 2005) (quoting <u>Horton v. California</u>, 496 U.S. 128, 136-37 (1990)); <u>United States v. Collins</u>, 321F.3d 691, 694 (8th Cir. 2003). <u>See</u> <u>also</u> <u>United States v. Arias-Cardenas</u>, 36 F.3d 36, 38-39 (8th Cir. 1994) ("Being lawfully in the house, Agent Burchette was free to look around. Most, if not all of the evidence seized was in plain view. In these circumstances, the warrantless search was not unlawful and there is no reason to suppress the evidence.").

The court has already determined that the detectives' actions in initially entering the home, from which vantage point Detective Miller saw the weapon in "plain view", were lawful. The defendant argues that the "incriminating nature" of the weapon, however, was not immediately apparent. The court rejects this argument. "The 'immediately apparent' requirement means that officers must have 'probable cause to associate the property with criminal activity.'" United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995). It has long been recognized that guns are "tools of the trade" in drug manufacturing and distributing. See United States v. McClain, 171 F.3d 1168, 1171 (8th Cir. 1999) (citing United States v. Regans, 125 F.3d 685, 686 (8th Cir. 1997) (observing that a firearm is a "tool of the trade" for drug dealers and that "an enhancement may be given even where the drug offense only involves possession" as opposed to distribution, recognizing that the "guidelines target the increased risk of violence when a gun is combined with any drug felony.").

Finally, the court also rejects the defendant's argument that Detective Miller did not have a "lawful right of access" for the weapon because the defendant refused his consent to search his residence prior to Detective Miller approaching the weapon. Even when consent to search is refused, a police officer cannot be forced to ignore a potentially lethal weapon lying in plain view, in a location equidistant between himself and a suspect. See United States v. Malachesen, 597 F.2d 1232, 1234 (8th Cir. 1979) ("Although the incriminating nature of the handgun may not have been immediately apparent to the investigating officers, its temporary seizure, unloading, and retention by a responsible officer . . . seems a reasonable precaution to assure the safety of all persons on the premises during the search."); United States v. Pillow, 842 F.2d 1001, 1004 (8th Cir. 1988) (finding lawful the seizure of a gun in plain view as a reasonable safety precaution);

United States v. Antwine, 873 F.2d 1144, 1147 (8th Cir. 1989) (reading Quarles[2] to imply that a warrantless seizure of a weapon may be considered "reasonable" for Fourth Amendment purposes when justified by an officer's legitimate concern for someone's safety, and finding it to be in accord with the Eighth Circuit's long-held view that the legitimate concern for individual safety may constitute "exigent circumstances" justifying warrantless searches).

In sum, the court finds Detective Miller's actions in approaching the weapon and examining it to ascertain whether it was real, and then returning it to the countertop upon determining that it was not an actual gun, even though occurring after the defendant refused to consent to a search of his residence, do not violate the Fourth Amendment.

### Officer Howard's Re-entry Into the Residence

Finally, the defendant challenges the constitutionality of the initial protective sweep of his residence, during which a methamphetamine laboratory was observed in a bedroom. The defendant argues that this sweep was unlawful as the officers had no idea that anyone else was in the residence. The defendant also challenges Detective Miller's re-entry into his residence with Officer Howard, after the initial protective sweep was conducted. The government responds that the cursory search was permissible both to look for additional suspects and to ensure officer and neighborhood safety.

"Under Maryland v. Buie, 494 U.S. 325, 337 (1990), a 'protective sweep' is justified in connection with an in-home arrest if an officer reasonably believes that the area to be swept harbors an individual posing a danger to those at the arrest scene." Boyd, 180 F.3d at 975 (citing United States v. Cunningham, 133 F.3d 1070, 1073 (8th Cir. 1998)). An officer's belief must be based upon "specific and articulable facts." Id. Evidence discovered in plain view during the course of a protective sweep is admissible at trial. Id. at 976. Moreover, cursory searches may be justified by the exigent circumstances

---

[2] New York v. Quarles, 467 U.S. 649 (1984).

exception to the warrant requirement. United States v. Walsh, 299 F.3d 729, 733 (8th Cir. 2002). "A warrantless search is reasonable when justified by both probable cause and exigent circumstances." United States v. Parris, 17 F.3d 227, 229 (8th Cir.), cert. denied, 511 U.S. 1077 (1994).

In this case, Detectives Miller and Gerber were responding to the report of an individual purchasing known methamphetamine manufacturing materials. Upon lawfully entering the defendant's residence, who matched both the physical and vehicle description given the detectives, the detectives saw in their plain view aluminum foil, baggies, propane torches, cut straws, a full-face gas mask, various weapons, and encountered a second individual in the residence who provided false identification. Neither the defendant nor the second individual claimed ownership of or knowledge regarding the Chevy Lumina parked directly outside the residence. Therefore, upon arresting both the defendant and the other individual, Detective Miller instructed the back-up officer to conduct a walk-through search of the residence, during which a methamphetamine laboratory was discovered in a bedroom. As the back-up officer was not clandestine laboratory certified, he asked Detective Miller to examine the lab to ensure it did not pose an immediate safety risk either to the officers or to the neighbors. Detective Miller determined that there was no immediate danger. Officer Howard was then called to the scene and, upon his arrival, escorted back to the site of he methamphetamine laboratory by Detective Miller. Officer Howard served as the affiant for the search warrant application, and attached Detective Miller's report to the application.

Under these circumstances, the court concludes that the protective sweep was properly conducted. See Boyd, 180 F.3d at 976 (noting that law enforcement officers have no way of knowing how many people are present when they enter a house); Walsh, 299 F.3d at 734 ("The potential hazards of methamphetamine manufacture are well documented, and numerous cases have upheld limited warrantless searches by police officers who had probable cause to believe they had uncovered an on-going

methamphetamine manufacturing operation.") (citations omitted). Detective Miller and Officer Howard's re-entry into the residence following the initial protective sweep does not change this conclusion. Id. (holding officer's actions in performing second cursory search of storage shed to confirm that there was no imminent risk of fire or explosion and then leaving to secure a search warrant complied with the Fourth Amendment standard of reasonableness).

For the reasons discussed above, **IT IS RECOMMENDED**, unless any party files objections[3] to the Report and Recommendation within ten (10) days of the date of the report and recommendation, that the defendant's motion to suppress (docket number 24) be denied.

May 20, 2005.

*[signature: John A. Jarvey]*
JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT

---

[3] Any party who objects to this report and recommendation must serve and file specific, written objections within ten (10) court days from this date. A party objecting to the report and recommendation must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections.